[Civ. No. 25088. Second Dist., Div. Three. Nov. 15, 1961.]

SAMI SCHONBERG, Plaintiff and Appellant, v. ANNA PERRY, Defendant and Respondent.

William Barnett Spivak for Plaintiff and Appellant.

Jerome L. Ehrlich, Edgar F. Gross, Ball, Hunt & Hart and Joseph A. Ball for Defendant and Respondent.

VALLÉE, J.—Appeal from an order granting a motion for a new trial.

Although the pleadings are not part of the record on appeal we gather from the briefs that the action is one for damages for alleged fraud on the part of defendant, Anna Perry.

The jury's verdict was for plaintiff. Defendant's motion for a new trial was granted on the ground of insufficiency of the evidence to justify the verdict. Plaintiff appeals.

Anna and David Perry were married in Antwerp, Belgium. They lived in Italy seven years and then came to the United States. They have accumulated a net worth of three million dollars since their arrival in the United States.

We summarize plaintiff's proof. He lived in Antwerp, Belgium; he had been engaged in buying and selling diamonds since 1946. Defendant is his second cousin. In June 1958 defendant, her husband, and daughter Lilyan went to Europe. They saw plaintiff in Antwerp. After traveling on the Continent defendant and Lilyan returned to Antwerp. There defendant told plaintiff that while in Italy she had made a connection with Michelangelo Fucile, a ship owner who carried refugees from North Africa from whom he obtained jewels cheaply; there were diamonds available which she had seen and which had not been smuggled; she was pretty sure he could get them at very attractive prices; she knew Fucile very well, had business with him before and they trusted each other; she would have to be personally present when he met Fucile and plaintiff would have to pay her expenses of about $500, to which he agreed; she had told Fucile she would bring a man to him whom he could trust and she wanted a commission on any business done by plaintiff. Plaintiff gave defendant $1,000; $500 was for expenses and $500 was a loan. Defendant gave him a check for $500 postdated February 5, 1959. Plaintiff went to Genoa, Italy, by way of Spain and met defendant, Lilyan and Fucile. In Genoa defendant told plaintiff the diamonds she had seen had been disposed of but Fucile would have another lot available which plaintiff would be able to buy at attractive prices.

Defendant took plaintiff to a café where a person who defendant said was an employee of Fucile showed plaintiff a ring containing a 4- or 5-carat stone. Defendant told plaintiff the stone was a a sample of a lot of diamonds weighing about 460 carats and costing more than $100,000, that Fucile wanted $40,000 produced to show plaintiff's ability to buy the diamonds. Plaintiff agreed to put up the money and telephoned his banker to forward it to American Express Company in Genoa in defendant's name. The next day defendant, Lilyan, Fucile, and plaintiff went to the Express Company. Fucile and plaintiff remained outside. Defendant and Lilyan went in. When they came out each had an envelope. They told

plaintiff they had $35,000. Later defendant told plaintiff the money had been turned over to Fucile. Plaintiff did not obtain any diamonds and no part of the $35,000.

 The order of the trial court granting a new trial will be reversed only when it can be said as a matter of law there is no substantial evidence to support a contrary judgment. (*Gibson* v. *Stuck*, 125 Cal.App.2d 340, 342 [270 P.2d 17].)

 There is abundant substantial evidence to support a judgment for defendant. We relate such evidence in some detail.

Plaintiff was an experienced diamond merchant. He had customers in the United States, Canada, Sweden, New Zealand, Australia, and Guatemala. Since 1958 his annual sales of diamonds were $48,000 to $148,000 a year. In one year he purchased $167,000 worth of diamonds.

Defendant has always been a housewife. She has raised two children and has two grandchildren. She has had no business experience.

In June 1958 defendant, her husband David, and her daughter Lilyan went to Europe. They visited Antwerp. David returned to California. In Italy defendant and Lilyan met Michelangelo Fucile, a boat owner. They rented boats from him during their six-week stay in Italy. Leaving Italy, they returned to Antwerp.

In Antwerp defendant renewed acquaintance with plaintiff, her second cousin. He had previously visited defendant and her family in Beverly Hills. Plaintiff took defendant and Lilyan to dinner. In relating how they had spent the summer, defendant told plaintiff about meeting Fucile. Lilyan told him Fucile had told them exciting tales of adventure; he had smuggled arms into Israel; he had been decorated by General Clark for bringing American soldiers to the beach; he brought merchandise, including diamonds, liquor and cigarettes, from North Africa; he stayed outside the limit and transferred the goods to fishermen to bring them into Italy. Plaintiff asked if they had seen the diamonds. They both said no, but Fucile had said there were 10 to 12 diamonds of 5 or 6 carats each.

Plaintiff asked Lilyan if she could get in touch with Fucile. She said she had his address. Plaintiff urged her to call him. On the back of a menu plaintiff wrote in French questions to be asked Fucile. He told them to ask if the diamonds were old or new cut. Neither defendant nor Lilyan understood. Plaintiff drew diagrams on the menu to show the difference. He told them to ask Fucile if payment for diamonds could be

made out of Switzerland. Plaintiff wrote this on the menu. That night defendant attempted to telephone Fucile in Genoa. She was unable to reach him. Two days later he returned the call. Defendant told him her cousin, Sami Schonberg, wished to meet him. She asked the questions requested by plaintiff but Fucile refused to talk about diamonds over the telephone. Defendant reported the conversation to plaintiff.

The next day defendant received a card from Fucile. He said the diamonds which he did have had been sold but he would meet plaintiff. Defendant showed the card to plaintiff. Plaintiff insisted they go to Genoa immediately at his expense. Defendant and Lilyan agreed. Defendant said she needed some money and asked plaintiff to cash a check. He cashed one for $500, asking that it be postdated to February 1959 as he would be in the United States and would cash it at that time.

Plaintiff left for Genoa two days later, going by way of Spain. He gave Lilyan $500 for expenses and said he would meet defendant and Lilyan in Genoa. Fucile met plaintiff, defendant and Lilyan in Genoa, took them to a hotel and to dinner. After dinner defendant and Lilyan left plaintiff and Fucile alone.

Defendant and Lilyan remained a week in Genoa. Plaintiff and Fucile spent each morning together, with one exception. One day plaintiff, Fucile, defendant, and Lilyan had lunch together. A man approached the table and was introduced by Fucile as Nino. Plaintiff, Fucile, and Nino went to another table and talked. About 15 minutes later they returned. Plaintiff said he had seen a beautiful ring about 5½ carats, blue-white. That night defendant told plaintiff they were leaving the next day for Nirvi. Plaintiff begged them to stay another day, saying he was expecting some money from Switzerland which he had ordered in defendant's name. Defendant asked him why he had done that. He said an American citizen could withdraw a large sum of money without question.

The next day plaintiff, Fucile, defendant, and Lilyan went to the office of American Express Company in Genoa. Plaintiff had drawn $30,000 on a Swiss bank to the account of defendant. Defendant and Lilyan went into the office. Plaintiff and Fucile stayed outside. One of the officers of American Express told defendant this was a large sum of money and suggested it be kept in the American Express office for safekeeping. Defendant told him they needed it at that time.

The $30,000 was placed in an envelope and carried out by Lilyan. The four took a cab back to the hotel. In the cab Lilyan gave the envelope with the money in it to plaintiff. Plaintiff handed it to Fucile. On arrival at the hotel the four went to Fucile's room and plaintiff and Fucile counted the money. Plaintiff later told defendant and Lilyan he had given the money to Fucile. The next day, following the same procedure, defendant obtained an additional $5,000 from American Express Company. Lilyan gave it to plaintiff who, in turn, gave it to Fucile. Plaintiff expected delivery of diamonds worth $100,000 and had put up the money as a guarantee he could pay.

Two or three days later plaintiff told defendant something terrible had happened; Fucile had not delivered the diamonds. Plaintiff and defendant went to see Fucile. Fucile said he would give plaintiff a boat as security for the money. Plaintiff said he wanted the money. Fucile gave plaintiff a note for $35,000. Plaintiff returned to Antwerp. Defendant and Lilyan also returned to Antwerp, attempted to reach plaintiff, were unable to do so, and returned to Beverly Hills.

Defendant and Lilyan each testified she took no part in any conversation between plaintiff and Fucile with reference to the diamonds except they were present after plaintiff had told defendant Fucile had not delivered.

Shortly after defendant returned home one Dolinger, a New York diamond merchant, telephoned her. He said he was a partner of plaintiff. He asked her to write a note stating she had taken plaintiff's money. He said he had receipts showing she had received the money, called her a thief and told her unless she sent him $17,500 immediately he would break up her home. Defendant hung up.

The trial judge was not compelled to believe plaintiff's version of the strange happenings. He may have inferred plaintiff was a shrewd, unscrupulous diamond dealer who believed he could make a deal with an equally shrewd and unscrupulous boat owner who was smuggling diamonds into Italy and buy them below their real value; that Fucile received the $35,000 from plaintiff and did not deliver the diamonds; and that defendant and Lilyan were innocent witnesses to the events.

In *People* v. *Love,* 51 Cal.2d 751 [336 P.2d 169], the court stated (p. 758):

"[I]t has been said that one of the most prolific causes of miscarriages of justice is the reluctance of trial judges to

exercise the discretion with which they are clothed to grant a new trial when the circumstances show that justice would be thereby served. This by reason of the curtailed power of appellate courts to disturb the discretion of the trial court once it is exercised in such matters."

Affirmed.

Shinn, P. J., and Ford, J., concurred.